CaRUTHERS, J.,
delivered the opinion of the Court.
This bill is filed to recover several slaves in the hands of the various defendants, vendees of the husband of complainant, and one Thrower, her son-in-law, or those claiming under such sales.
These are the facts: Richard B. Taylor, the first husband of complainant, died in Mecklenburg ■ county, Virginia, in 1801, leaving a will containing this clause: “Fourthly, I give to my wife the use of one negro girl named Milly, during her life. After her death, should *139 my daughter Ann 0. Taylor be then living, I give the said negro and ber increase to her and her heirs for ever; but should my daughter Ann C. Taylor die before my wife, I then, in that case, give the said negro and her increase to my wife Mary C. and her heirs for ever.”
The slaves in controversy are all the children of Milly, and their increase. In 1803, the widow married Zachariah Bugg, who was living at the filing of this bill, but has died since the appeal to this Court. In 1817, the daughter, Ann C., married William Thrower. The next year, 1818, the slaves were divided by agreement in writing, the number having then increased to seven. Milly and three of her children were assigned to complainant, and the other three children to Thrower and wife, and a deed made, conveying and relinquishing title to each other, which was signed by the husbands and their wives and duly recorded, but only acknowledged by the husbands. Each party took possession accordingly. In 1820, they all moved to Tennessee, and claimed and sold the negroes as their own according to said division. Thrower sold all that fell to him before the death of his' wife, which occurred in 1826. Bugg sold some before and some after the death of Mrs. Thrower. To the latter no claim is urged in the argument, it being conceded that the purchasers of them got a valid title. The purchasers of the negroes, and those claiming under them, have held adversely and unmolested ever since the date of their respective bills of sale.
Upon this state of facts the question arises whether the defendants have a good title against the complainant.
This clause is more than half a century old, and all doubt and contingency in relation to it were removed *140 in 1826 — thirty years since — by the death of Mrs. Thrower. The complainant has slumbered upon whatever rights she may have had, for the time allotted for one generation to pass off and another to come upon the stage. These slaves have been sold and resold, and some of them more than once distributed as a part of dead men’s estates. All this time men have been allowed with confidence to vest their money in them and repose quietly upon their title. Under such circumstances, a right should be made very clear, to authorize the Courts to sustain it. Such suits are certainly not entitled to very great favor in a court of equity. If they succeed at all, it must be by force of the rigid rules of law. It is true, however, that time is not a witness against a feme covert, nor does it often raise presumptions against her for the destruction of her rights.
This case has been elaborately argued for the complainant, and a great many principles discussed, when it must at last turn upon a few simple rules, as we will see.
1. By virtue of the will, the complainant and her husband had a clear and unquestionable life-estate in all the slaves up to 1818, which was at any time liable to be augmented into an absolute estate by the death of her daughter. But then, if her daughter should outlive her — which was most likely, as one was young and the other more advanced — the remainder would pass from her and her heirs, and vest in the daughter and her young-husband. Now, in view of these chances, the two husbands, with the concurrence of their wives, concluded to make a division of the slaves, by which the mother, probably on account of her life-estate, was allowed the ad *141 vantage of four to three. This was certainly a most judicious arrangement for the benefit of complainant, under the circumstances before them, as, by any correct calculation of chances, they were greatly in favor of the daughter outliving her, and in that event she would have lost the remainder in all, whereas, by it, she secured one more than the half in fee. The terms were liberal to her and against the daughter; still, all acquiesced in them, and should in good conscience be held to them, unless there is some rule of law which forbids it. It is true, as has been held in many of our own reported cases, to which we have been referred, that a married woman is not bound by a conveyance of her personal estate jointly with her husband, no matter under what solemnities, except in some eases, by privy examination in Court. Wilks vs. Fitzpatrick, 1 Humph., 58; Caplinger vs. Sullivan, 2 Humph., 550. Nor can any sale of his before possession, either with or without her concurrence, in writing or otherwise, stand against her right by survivor-ship, nothing else occurring to take the case out of that rule. But this was not the ordinary case of selling the property of the wife not yet reduced to possession, or disposing of her reversionary vested rights. It was a fair and equitable adjustment between the husbands of two married women of the contingent interest of both in the same property. In view of the chances in favor of each for the whole property in fee to the exclusion of the other, the arrangement was certainly most favorable to the complainant. So she and her husband, acting for her best interest, thought, and jointly made a deed with warranty of title to Thrower for the three that fell to him, and received the same sort of deed from Thrower *142 and wife for tire four allotted to them. Under these acts and writings possession was taken on both sides, and has been held for forty years. It was not therefore the case of a sale of a present chose in action of the wife, or a certain remainder or reversionary interest, but the adjustment of a contingent claim, upon which an uncertain and doubtful right to the whole was reduced to certainty as to half, and possession given and taken, accordingly, of the parts assigned to each. We are not prepared to admit that this would not, under all the circumstances, bind the wives of both, and fix the right of property in their respective husbands, without regard to after-events. If Mrs. Thrower had been the longest liver, could she have repudiated the division and set up her claim successfully for the whole property against Bugg or his vendees ? That would certainly be as strong a case as the other. But let that be as it may, there is another ground upon which the complainant must fail,
, according to the decided current of authority here and elsewhere.
2. A sale made by a husband of his wife’s remainder or reversionary interest in property will be good against her right of survivorship in case the husband or his as-signee gets possession upon the termination of the intervening life or contingent estate before his death. The case of Caplinger vs. Sullivan, 2 Humph., 548, so much relied upon in the argument for complainant, settles this question against her. The main point in that case was, •that where the husband, who had bought in the life-estate, sold the fee, such sale would only be good for the life-estate which he had bought, and could not affect the remainder-interest in his wife, so as to defeat her right by *143 survivorship in favor of the husband’s vendee. But it is further held in that case that if the tenant for life had died before Sullivan, the husband, so that a right to the present possession of the property had devolved upon the husband, the actual possession in his assignee, Caplinger, would have made his title perfect. But as Sullivan died before Mrs. Eelts, the life-owner, there never was a time when he could have reduced the remainder-interest of the wife to possession, and therefore no sale of it by him could defeat her right. The Court expressly say in that case, “If the husband, having assigned, had continued to live till the lifetime-estate had terminated, then indeed, as a Court of Chancery views such assignment as an agreement to assign when in his power, and considers that also as done which ought to have been done, the assignee for a valuable consideration would, in equity, have been entitled to the property.”
To sustain the doctrine of this case, reference is made to the leading English cases of Purdew vs. Jachson, 1 Russ., 1, and Manner vs. Morton, 3 Russ., 65. The proposition cited above is fully sustained by those authorities; but the point is very much controverted in the books, and cannot be regarded, probably, as a settled question, except where possession is obtained by the assignee, after the falling in of the life-estate, his assignor, the husband, still surviving, or, which would be the same, having actual possession before the event, retains it afterwards by himself or some other holding under him.
The case of Dearen vs. Fitzpatrick, Meigs, 559, had before clearly settled the principle, that “after the property of the wife (and that was a legacy) has been *144 reduced into possession by tHe husband or his assignee,” the wife’s right to a settlement, the much-favored “wife’s equity,” is gone. It would have been otherwise where the right was asserted before the reduction to actual possession by the husband or his vendee. 2 Story Eq., §§ 1413, 1403. Clancy on Eights, 471. In this same case, coming before the Court again the next year, and reported in 1 Humph., 58, it was held that the assignee of the husband could not resist the wife’s equity in any portion of the property not reduced to possession previous to her application. But this distinction is palpable and well settled. In a case like that of Dearen vs. Fitzpatrick, where there is a present right of possession when the husband sells, he stands on higher ground than the wife, if he has obtained actual possession before she makes her application to the Court for a settlement, or before she becomes entitled by surviving her husband. And in the other class of cases of which Caplinger vs. Sullivan is an example, the right depends upon the same fact, that is, whether the husband while he lived was entitled to immediate possession of the wife’s remainder by the termination of the life-estate, and such possession was actually obtained by him or his assignee before his death.
Now, is not this principle, so well established, decisive of the case under consideration? The deed made by the husband Bugg, at the division in 1818, to say the least of it, is a conveyance absolutely by him and with warranty to Thrower of three negroes, who sold them all to others, as charged in the bill. Here, then, was actual possession by the assignees of the husband; and was *145 there ever a time when Bugg bad a present right as husband to recover or enjoy the possession? This was certainly the case after the death of Mrs. Thrower in 1826. After that contingency had happened, if the division of 1818 had not affected her title to the whole of the negroes, it was from that time a perfect and absolute title — the previous life-estate was merged in the fee. Is it not clear that, on the principle stated, the title derived from the husband of complainant, being then accompanied by actual possession, would be paramount to that of the wife ? If the husband had not sold until that period, and held possession himself or had afterwards obtained it, there would be no question as to the attachment of the marital right and the perfection of his title against her and all others. But his assignees stand in his shoes, having all his rights, and the fact of possession produces the same results.
Can there be any doubt, then, independent of the obligatory force of the contract of division in 1818, that the complainant’s rights are gone to these negroes ? It will be at once seen that the same principle which defeats her right to the Thrower negroes must apply with equal force to those which were sold by Bugg to others, whether before or after the death of Mrs. Thrower. If after the contingency, it is conceded there is no doubtand if before, it must be held that the same result is produced, because, upon the happening of the event which made the title perfect, the right of Bugg to take possession, and thereby perfect his marital right, would pass at once to his assignees.
In this view, it becomes unnecessary to notice the statute of limitations, the effect of the Virginia laws, *146 and other questions made in the ease and argued by counsel.
The decree dismissing the bill must therefore be affirmed.